Here ye, here ye, Mr. Honorable Appellate Court of the Second Judicial District is now back in session. The Honorable Anne Lee Jorgensen presiding. Oh, please be seated. I apologize. Your Honor, the final case on the docket this morning is 2-22-0414. People of the State of Illinois claim to have the lead being Frank E. Diamond, defendant and appellant. Arguing on behalf of the appellant, Mr. Gilbert Lambert. Arguing on behalf of the appellee, Mr. Max Coos. Okay, gentlemen, are you both ready to proceed? Yes, Your Honor. Then when you're ready, sir. Good morning, Your Honors. Good morning, sir. My name is Gilbert Lentz from the DePaul Legal Clinic, and I'm here on behalf of Frank Ryan. Your Honors, as you know, Mr. Ryan has presented two arguments to this Court, and I'd be happy to answer any questions the Court has about the second argument concerning the judge's violation of Rule 430B, allowing Mr. Ryan to remain shackled during his trial. But I'd like to focus my remarks this morning on the first argument concerning the sufficiency of this trial. Your Honors, when the State charged Mr. Ryan with attempted murder, the State took on the burden to prove beyond a reasonable doubt that Mr. Ryan acted with an intent to kill and could have only been acting with an intent to kill. This is the highest burden that the State can take on in proving the mental state element for any offense. So even if the State's evidence proved that Mr. Ryan acted in conscious disregard of a known risk that death or great bodily harm could occur, that is, if they proved he acted recklessly, that would not be enough for attempted murder. Even if the State proved that Mr. Ryan acted with knowledge, knowing that death or great bodily harm were practically certain to result, attempting to commit knowing murder, that would not be enough. Would it be? Yes, Your Honor. Would it be? You can see that the evidence of what the defendant did, his physical acts, was overwhelming. It was premeditated. He stalked the victims. He surreptitiously looked at Leslie's text. He found out when the victims went to bed at night, had been outside the neighborhood, purchased the items at the hardware store, went to the home, drilled a hole, put the tubing in, hid it behind furniture, and fixed it to the gas pipe, and so on. And then when he gets arrested, he lies to the police. So, not even arrested, he goes voluntarily to the police department, right? What more did the State need to prove the defendant intended to kill the occupants of that home? Well, the facts, Your Honor, detailed are undisputed. But even taking that conduct together, that only proves that he intended to commit some kind of offense. And he knew he was committing some kind of offense. Why is it different than a handgun? You know, pointing a handgun at somebody, pulling the trigger, unfortunately, for the, for example, I'll give you this, which is from a real case. Defendant loads a weapon, leaves it in a particular location. Somebody enters who he knows is going to be there, and the person doesn't expect him. The defendant retrieves the gun, pulls the trigger. It doesn't go off, because unbeknownst to him, his wife emptied the gun. Does he commit attempt first-degree murder? I think... Does he commit attempt first-degree murder? Substantially, that would be a significant step toward the act with the intent to do so, yes. But in that case... How is what he did different than that analogy? It's different from that analogy because he knew what his, the instrumentality that he was using was natural gas, which is not like a gun. When you point a gun, as this Court is very familiar, there's many attempt to murder cases where someone points the gun at someone. He also took steps to eliminate the risk that he was going to be caught. He parks the car down the street. He covers the camera with duct tape. So he's taking steps to prevent his identification. What other purpose was there to put natural gas inside the home and go through all this planning and carrying out the plan? How is that not intent to kill him? The question is, when you're looking at, when you have a circumstantial case like this, the question is... This is not a circumstantial case. The defendant's statements, that is direct evidence. And the judge did not have to believe his explanation. In fact, the Court said it was his explanations that were just not worthy of belief. The Court said that Mr. Ryan said that every time you read about this sort of thing and there was an explosion, it was after the gas was on for a few days after an explosion, after someone was on vacation, and it exploded. And here's what the Court said. But we all know that's not true. When you do what he did, you do it for only one purpose, and that's to blow up the house. And he acted with intent to kill. He went out to kill those people in the house by blowing it up. The fact that he failed to do so is not an element of the offense. It's not a defense to the offense of a first-degree murder. And that's the thing. We must, would you agree, take the evidence in the light most favorable to the State. And this judge made the credibility determinations. He didn't believe the defendant's statements. Well, I'll start a response to that, Your Honor. One, the judge's finding that we all know that it's not true wasn't based on any evidence presented by the State. The State didn't present any evidence about when gas, or this particular gas leak, would cause the risk of an explosion. A fact finder, a trial judge, just like a juror, is not required to leave his common sense at the door. A trial judge can use his common sense. And he was making a determination that it's a matter of common knowledge. It's a matter of common knowledge that natural gas is a dangerous efficient and also can lead to an explosion. In fact, it was just the case the other day about another gas explosion. It's very, very dangerous. That's a matter of common knowledge. And it's also a matter of common knowledge that gas has a very distinctive odor that's easily detectable. The State's own expert testified that natural gas is detectable in a very, very small quantity. And it's designed to be such. Because it's so dangerous. Because it's dangerous. Because it's so dangerous. And we're capped in. And in this case, the defendant got very lucky that the victims woke up. And that speaks to the fact that natural gas is designed to be easily detectable in very, very small quantities differentiates this case from the hypothetical gun case Your Honor described earlier. Guns are well known to be instantly lethal when you point at someone and fire from short range. Natural gas, no matter how dangerous it is, is not directly lethal. And it's easily detectable at very, very small quantities. So when this Court's looking to whether you can infer an intent to kill from what isn't, it is a circumstantial case when you're looking at what the specific intent was here. And if you, I'm sorry. No, go ahead. I'm sorry. If you're looking at whether you can infer specific intent to kill from these facts, the fact, the most natural, the question is what was the most natural and probable consequence of his conduct? And that was always in this case that someone would detect the gas before it rose to the level of danger. Where's the evidence to that? May I ask, I mean, does the timing of these incidents or the occurrences, does that speak to the intent one way or the other? This was late at night, in the dark. Well, the timing, I believe, speaks to his wish to avoid being seen while he was doing this, to avoid, to evade detection. But, again, planning and trying to evade detection speaks to a general consciousness of guilt that he knew he was committing. But you say it happens then that people would be asleep. Correct. Which could support a conclusion that there was the specific intent to kill. Would you agree? I would not agree because of the nature of the instrumentality used here. This was not an odorless gas. I would contrast this case, I would contrast it certainly with a shooting case, but also I'm taking an example of someone who's trying to poison a victim, two people trying to poison two separate victims. The first person uses a substance that's completely undetectable and knows it's lethal. The second person uses a substance that's easily detectable, like, say, pours chlorine bleach in a drink, and the victim smells it, is going to be scared, but it's not reflected. The nature of the instrumentality in this case does not reflect an intent to kill because it was the most natural and probable consequence. As Mr. Rickard's own conduct shows, he testified at the gas. How is the victim's conduct even relevant? How is it relevant? He, for your client's good fortune, he woke up. It's relevant in this case to show that the nature of this instrumentality was so easily detectable that there's no reasonable inference that he could have only been acting with an intent to kill, but in using these particular instruments. Mr. Ryan did not do anything more to ensure, as the state's own expert testified, simply having gas in the house is not sufficient to cause an explosion. What was his motive? Why did he do this? He was obviously obsessed with Leslie, right? Kelsey, I believe the name. Yeah, but he said that he only intended to scare them, and that was the most probable consequence of this conduct, again, because he used instrumentality that was easily detectable, and he didn't take any further steps to ensure that it was at that level. The trial court didn't believe him, and you're asking us to reweigh the evidence and to give his interpretation of the evidence an innocent interpretation when, in fact, as the trial court pointed out, he started out lying from the beginning, and he only starts telling the truth when he realizes the police have evidence against him. Well, if the court asked what the evidence was, the direct evidence of what his intent was, the only direct evidence is what he said, so I'm really stating what he told the police. The court may wish to disregard that statement, and then it must look at the circumstantial evidence indicating what his intent might be, and the most important facts there are what instrumentality he chose to use and whether he took the opportunity, which he had, to ensure that it would be even more deadly, or even more dangerous, that would rise to the level of... Let me ask you this. Yeah. And here's one of the facts, the placement of the tube. He hides it. He hides it. If he was just doing this to scare, why would he hide the tube behind furniture inside the house? Well, he never entered the house during this. I don't think he ever entered the house at all, so I don't think there was any evidence that he knew there was furniture on the other... The hole was right where the gas source was. I don't think he knew anything about what was on the other side of the wall. He had been in the home, right? I'm sorry? Had he been in that home? I don't believe he had been in the home. He had been to the home, but there was no evidence that he entered the home.  No, we don't know. Okay. But I don't think there's... I think the only evidence about where the pipe... The hole was is that it was where the pipe was. So... So, you know, the state did prove a lot in this case. They proved that gas is dangerous. They proved that, you know, Mr. Ryan's comment that the physical acts are undisputed. But when the state takes on this burden, it must prove intent to kill. And only... He could only have been acting with intent to kill. And these facts, even taken together, even in the light most favorable state, don't add up to that because of the nature of natural gas. May I ask, with respect to the alleged due process violation, how significant is it that this was a bench trial? It's certainly... Courts certainly find a higher degree of prejudice when a jury sees the shackles. But the old Supreme Court has been very clear that this rule... This was in Reese. This rule applies equally to bench trials as well as to jury trials because the dignity, the ability of a defendant to appear in court unshackled before a judge is just as important as his ability to communicate with his defense counsel. You know, the old Supreme Court... But the language the Supreme Court uses and the language that they use to write Supreme Court Rule 430B cannot be more clear. They condemn this practice. And I'm sure this Court is aware this happens in many cases despite that consistent condemnation. Here, we know he was shackled during the trial. And we know that he wanted his hands free to be able to communicate with his own lawyer. So he did provide a reason why this was prejudicial to him. And that's what differentiates this case from other cases where the convictions were affirmed. It was preserved because it's a constitutional error. So the lack of a claim in the post-trial motion is irrelevant. But, again, it also qualifies as plain error. You argue that under plain error that the evidence was closely balanced. You're familiar with the Supreme Court case law and closely balanced in this Court's determinations. Closely balanced exists where there's two credible versions and neither is supported by extrinsic evidence. I'm paraphrasing. And here there is extrinsic evidence, correct? Well, the circumstantial evidence that you discussed earlier supporting the State's theory and the testimony of the State's witnesses. Well, I would say it's a classic case of closely balanced evidence described in cases like Seve where there's two competing kinds of evidence. Let me finish. But that's not the only way evidence can be close. And here, even taking as under the first argument, even if the Court disagrees that no reasonable trial fact could have found the head intent to kill, at minimum, the facts of this case are so unusual and this instrumentality is so, like, indirectly lethal that the evidence as to whether the head intent to kill was at least close. It's indirectly lethal if there's an accident. And here the judge found that his intent was direct, that he intended to direct that gas into the house to either asphyxiate the victims or blow them up. That was the trial court's finding. The judge found that, and I don't believe that the evidence based on what Mr. Ryan did, his actual conduct, could support that inference. And that's why, at minimum, the evidence was closely balanced such that the shackling error requires a new trial. So for those reasons, Your Honor, thank you. We ask that you reverse Mr. Ryan's conviction or reduce it and remand for resentencing and a further alternative, remand for a new trial. Thank you. Thanks very much. You will, of course, have a chance for a reply. Counsel, are you ready? Yes. Thank you. May it please the Court. Counsel. I am Max Lusser. I represent the people of the State of Illinois in relation to this prosecution. And first I will be reviewing some of the specific evidence as to defendant's intent, as that evidence, not only of its intent but guilt generally, resolves both issues in this claim, both first the sufficiency of the evidence and second, under harmless error, of whether there is a problem with him being restrained. With respect to the restraints, isn't that something that the prosecutor should have pointed out? Even if the judge forgets, the State's attorney should point out, should he not? That would be the Supreme Court Rule 430. That would be preferred, Your Honor. Yes. And the two primary points that this prosecution is relying on is forfeiture and harmless error in that regard. And as part of that harmless error is the specific evidence from this case, I won't belabor the points raised during defendant's initial argument. However, there are specific... Trial counsel did, on your argument about forfeiture, trial counsel did bring it to the attention of the court and asked that his client be allowed to unshackle one of his arms so he could take notes. That's correct. So why is that not preserving the issue? Because he didn't follow up and request a review from the court of why it wasn't taking additional action or otherwise making a finding, the defense has an obligation under the forfeiture principles not only to identify a problem but ask the court to place the matter on the record so that in the event that it comes up on appeal, your honors have the ability to determine the length of the restraint, the manner of the restraint, what... So he should have asked the judge to make specific findings? Yes. He has that burden and duty? Yes. Not only to raise that the restraints are there so that the court is aware of it and has the obligation under people's views. Well, he clearly asked, though. Yes. It's up to DOC or something to that effect, correct? Yes. So the judge denied it, but he was required to go further and say, then you need to make findings? Defense counsel actually asserted that there were some security issues at play by saying, I don't know if we have the manpower for it, reflecting if nothing else that the record is incomplete as to what was going on there. And so that's why the forfeiture... Maybe it was more in the nature of I don't know how you're going to rule on this, but this is what we want, this is what we're asking for. The judge says it's up to DOC, but he should have done more. Yes. There is specific requirements that if it is raised and the court does not provide an adequate ground, then defendant has an obligation to ask for the court to state why he's still being restrained functionally. Have we just established his post-conviction petition on ineffective assistance? I don't know, Your Honor. There's not a record here that will establish any impact on the defense. Most importantly, not only in these cases do we care about whether a jury would be prejudiced against him, but as N. Ray Markpe talked about in analyzing the Booth issue, there is also a concern of if there's an impact on the defense and his ability to assist with it. That is a factor that is not established by the record here. Not only was the evidence overwhelming against him, but more, defendant, the only thing we have in the record that Your Honors have before you is a request, may my client have his hand free in order to take notice. On that alone, this court doesn't have enough to find that defendant was materially impeded from participating in his defense. And for that reason, it's not established under this record. Did he appear in court in street clothes or in his jail garb? I don't have that information in front of me. But in any case, that would more fall under the first concern of people v. Booth at all, where we're concerned about the finder of fact having a problem with discerning that this man has a presumption of innocence, that they must resolve the case on the facts before it and not extrinsic matters such as his garb or his level of restraint. Unless there are further issues on the Booth issue, I'd like to – With regard to plain error, counsel acknowledges, and I think he would agree, that the physical evidence that the defendant's actions, physical actions, the evidence of that is overwhelming, but the evidence with respect to his intent is not. Why is counsel wrong? I have – first of all, the fact that the defendant went to build an alibi in the case, his actions beforehand, that he had his father wear his Fitbit to try to prove he wasn't there at the time of the offense, reflecting his knowledge it was serious. The fact that he texted his – that Kelsey, as was discussed before, he texted her specifically that he was going away for a long time, reflecting he was not trying to scare them, he was trying to kill them. He did everything right to kill two people, and it is only the fact that while they were asleep, they happened to wake up, that they are not dead today. Now, that relates to defendant's argument that natural gas is discernible, that you're able to smell it, that there is an over added to it. Defendant chose his time at a time, not only generally when people are asleep, but that these two people were asleep. He looked at the house, he saw that Kelsey wasn't there, and he knew that they would be asleep for another three hours before he made this decision to go ahead and pipe the full house's supply of gas into their home. In addition to generally doing so, he also knew that they slept on the third floor, thanks to having stalked them for some unknown amount of time. He also searched on his phone the properties of natural gas, and so he can't hide behind ignorance of how it works or what it does. One of the things that he knew about was that the concentration would be lower, or up high, where the victims were sleeping. Certainly one of the victims, if not both. And so the time when that victim became aware of the gas in such quantities that he could smell it, despite being asleep, would have been the time where going downstairs towards what he believed to be safety would only have been more dangerous by being a higher concentration of the gas. And that was borne out by the measurement that they made at the scene that the gas was at a higher concentration at the main floor and a slightly lower concentration above. This also relates to the property of the gas, the pooling, and that fatally undermines his claim that because it was detectable, it weighed in favor of him trying to give them notice. It wasn't detectable because they were asleep and he knew that. Further, his actions at the time, knowing they slept until 5, and the amount of gas. Defendant did not leave a burner going and then left the house. He drilled into the meter of the house and funneled the full supply of the entire house through the wall where it could go uninterrupted throughout. Is the judge's statement, when he said he doesn't believe the defendant, we know that's not true. When you do what he did, you do it only for one purpose. That's to blow up the house. Is that appropriate for a trial judge to do that? Absolutely. To make that conclusion because it's common sense? Yes, Your Honor. And not only that, but despite the defendant not testifying, the court also had a defendant's interview where the court was able to assess his demeanor in that case. While it is a piece of evidence that the appellate court is as able to review, the fact that the court reviewed it in the context of the trial with the other testimony, and just by virtue of being the finer of fact, there is still deference that is owed to the court through that as well. Lastly, the defendant's actions after going and loosing this full supply of gas on the two victims also communicates his intentions. His statement about hiring someone that he wanted to get, functionally a hit man to perform this gas leak on his behalf, especially when construed against the defendant, only indicates his intention to kill. There is no reason for him to talk about hiring someone to do this if it is not in the context of getting someone to kill for him. So you're suggesting that you can never hire someone to commit a crime other than murder? Not under these facts and under the proper way of construing the evidence, Your Honor. It is possible to hire people for any number of things. The people aren't disputing that. However, this evidence shows that the defendant was talking about a hit man. And moreover, that his claim to the contrary is absolutely unreasonable. Not only are reasonable inferences construed in favor of the prosecution, unreasonable inferences don't even get to be part of the discussion. And the idea that this defendant would go and hire someone to scare someone by leaking a full supply of gas into a house is absurd. And so it doesn't need to be countenanced by this court to the extent that it is entertained at any point. The standard overrides that concern. Do we know what happened to the defendant's other case, the unlawful use of weapons charge? Not offhand, Your Honor. I apologize. That was when he was found with a shotgun in the proximity of... Yes, he was later found parked in a caddy corner or aside from the house, but in view of it. He had the gun in his car, but nothing in this case is related to sentencing. It was a subsequent act. And there wasn't specific evidence of that submitted at trial. Was Judge Clement aware of that? That case was reported as well, correct? I believe so, yes. There is no indication in the record, however, that the judge based his findings on that behavior. Or based his determination with regard to the sheriff's office or whatever would have to make that request. Yes, that's correct. In addition to the facts that have been discussed already, the people would just like to emphasize the surrounding incredibility that the defendant displayed. The inability to find him credible, rather. Because of his repeated lies to law enforcement, they were immediate, they were pervasive, they were sophisticated by incorporating technology in the Fitbit, trying to not only incorporate his father as an accomplice, but also to premeditatively lie to the police in establishing that he was not there, and thereby indicating the seriousness of the offense that he was contemplating. Now, Your Honors, in addition to the sufficiency of the evidence, that evidence also relates to the restraint issue in the case. I don't want to belabor the point, but as argued before, not only is harmless error appropriate for the restraint issue, particularly under the record that we have here, where the only statement is that he would like to take notes, where there is no indication that it affected his defense, and that there is no indication that it would have an impact on the finding of guilt. That harmless error analysis should also be found in favor of the prosecution and protect defendants' convictions. Lastly, defendants' forfeiture, yes. Is there anything in the record supporting free and easy communication with counsel during trials?  Just to state the obvious, isn't the burden on you? It's not on them. If the error occurs, then it's on you to prove beyond a reasonable doubt that the error did not contribute to the verdict. Yes, Your Honor. And here, in light of the evidence, there is frankly not a reasonable finding that it would have changed the outcome of the case. Defendant was guilty, demonstrably, exhaustively so. While the restraints are not taken lightly by the people in this case, and we recognize the fact that people view abuse as good law, that there are reasons why it exists, here, in light of that evidence, in light of the record itself, and without resorting to speculation on what might have been going on with defendant and his attorney, there is no reason in the record here to find that there was harm resulting from that error. If Your Honors have any further questions, I'm happy to respond. Any questions? Nothing else? Thank you. Thank you, Your Honors. Counsel, if you wish to reply. Thank you, Your Honors. Turning first to the restraints issue, counsel, I believe, argued that there was the trial counsel below had a duty to request more than what he did. The rule is very clear on this. The rule says, whenever restraints are brought to the attention of the judge, the judge has a duty to hold the Rule 430B hearing. That's what counsel did here, and it was the judge's duty to hold that hearing, and that hearing was never held. Even if there was a forfeiture, we don't have to find forfeiture. We can ignore the forfeiture and address the issue, correct? Especially a serious issue like this. Absolutely, Your Honors. It qualifies as a first problem, plain error, because, again, the evidence as to the mental state element in particular was close. It was prejudicial because, unlike a lot of records involving restraints issues, we have a reason why it was prejudicial to this particular defendant. It hampered his ability to communicate with his own lawyer. At a time when he was not able to talk to the lawyer, it was when one of the state's experts was testifying, he can't talk to his lawyer in anything above, probably at all in that circumstance in a very quiet courtroom. So it did hamper his ability to communicate with counsel, which is an essential part of the defendant's right to be free from restraints. So whether it's a first problem or second problem, plain error, this Court should remand him to trial on that basis. Our first argument, of course, is that it's preserved and the state can't meet its burden to prove it was harmless beyond a reasonable doubt. On the first argument regarding the intent element, I believe the text message, just to clarify, the text message didn't say to Kelsey that I'm going away for a long time. It said I'm going away for a while. The state's evidence about the planning and the attempts to evade detection show that, you know, we're not contesting that Mr. Ryan was aware that he was doing something illegal, but all this planning, all the evidence about the planning and the deception, that's really, most courts look at that, look to that to differentiate between, to show the defendant's intent when the defense is that it was an accident or, you know, like the classic case is a shooting case where the defendant shoots someone but then says I didn't mean to shoot them. Then the evidence of planning would be very dispositive in that case. It's a very crude tool to try to differentiate between the specific mental states at issue. Here, they showed he attempted to commit, they definitely proved he attempted to commit some crime. What was he committing? What crime? Well, other than attempt to commit first degree murder. Well, what was the plan? The plan, given our argument that the most natural consequence of using natural gas and not some undetectable or instantly lethal instrumentality, the most natural consequence of all this was that someone would detect the gas. Your Honor pointed to a gas leak recently, this week. If I could talk about things not on the record, in that case I believe there was no one in the house to detect the gas. Well, the point is that what I was conversing with you about common knowledge, it's an everyday, you know, example of what we hear, what we end up as we, as the State pointed out, the trial judge is not required to ignore common sense. And here the trial court did not believe your client's story. He made it clear he believed that the evidence showed the defendant intended to kill the victims. And the instrumentality, although unique, does not necessarily, you know, or show that viewing the evidence in light most favorable to the State, that they did not prove intent to kill. I think in this case it does. I think the common sense element speaks to whether we know the gas is dangerous. We do. But the State's own evidence in this case showed that it's not common sense as to what specific is necessary to cause gas to be dangerous, what concentrations. You know, there was a lot of discussion about the concentration. The expert was unequivocal that you have to have more than just gas. You have to have an ignition source, which Mr. Ryan never introduced here. So common sense only gets you so far. And I think when you look at the common sense element, we all know gas is dangerous. Well, that to me says that fits almost perfectly the definition of recklessness. When you know something is dangerous and you do it anyway in conscious disregard of that risk, that's recklessness. The State may have proven that in this case, but it's a much higher step to say that he could have only been acting with an intent to kill. Thank you. Any other questions? Thank you. Thank you very much. Thank you both for your arguments this morning. This Court now is adjourned for the day. We will issue a written decision in due course.